UNITED STATES OF AMERICA

v.                                                                    Case No. 3:17cr130

BILLY CURRY, JR.,

    Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Billy Curry, Jr.'s Motion to Suppress.

(ECF No. 14.) In the Motion to Suppress, Curry seeks to suppress evidence the police seized and

statements he made after he was stopped and searched by Richmond Police officers. For the

reasons that follow, the Court will grant the Motion to Suppress.

## I. Procedural History and Findings of Fact

### A.    Procedural History

On October 3, 2017, a grand jury indicted Curry on one count of Possession of a Firearm

by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) An arrest warrant

issued the next day. (ECF No. 4.) Curry was arrested and had his initial appearance on October

12, 2017. (ECF Nos. 6, 7.) On November 21, 2017, Curry filed the Motion to Suppress. (ECF

No. 14.) The United States responded to the Motion to Suppress, and Curry replied. (ECF

Nos. 20, 24.) The Court held an evidentiary hearing on January 23, 2017, and ordered

supplemental briefing, which the parties timely filed. (ECF Nos. 28, 30, 31, 32, 33.)

Curry's Motion to Suppress is based on an interaction between him and Officer Stephen

Gaines and Officer O'Brien of the Richmond Police Department ("RPD"). Curry alleges that

Officer Gaines detained him, in violation of the Fourth Amendment,[1] without reasonable articulable suspicion that Curry was engaged in criminal activity. The issue before the Court centers on whether Officer Gaines had reasonable suspicion particularized to Curry that justified the *Terry* stop conducted.

## B. **Findings of Fact**

On September 8, 2017, four uniformed officers—Officers Gaines, Fitzpatrick, Janowski, and O'Brien—were on patrol duty in their capacity as members of the Focus Mission Team ("FMT"), a division of the RPD that concentrates on violent crime suppression and drug enforcement. The officers—all in the same marked car—were patrolling Creighton Court, a housing project located in the East End of Richmond, Virginia, where hundreds of families live. Officer Gaines testified that they had been assigned to patrol Creighton Court because "[t]here had been a rash of shootings and homicides." (Hr'g Tr. 7, ECF No. 29.) In the three months before September 8, 2017, there had been six shootings and two homicides in that area. The most recent homicide had occurred on August 28, 2017, ten days before Curry's interaction with the RPD.

At approximately 9:00 p.m., while patrolling in a grass field near the 2100 block of Creighton Court, the officers heard five or six gunshots. All four officers heard the gunshots, and all thought they came from the north, in the direction of Walcott Place. The officers then "initiated a U-turn in the field and started traveling in th[e] direction" of Walcott Place, driving through the grass. (*Id.* at 10–11.) The officers drove from their location near Creighton Court and parked near a sidewalk behind Walcott Place. The patrol car travelled two to three blocks,

---

[1] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

taking only about thirty-five seconds to arrive behind Walcott Place. The officers stopped the car in the grass behind the complex.

All four officers immediately exited the car when it stopped.[2] The grass behind the complex in which the officers stopped the car was an open field flanked on two sides by apartment buildings. The area was dark and illuminated mainly by lights attached to the surrounding buildings and the patrol car's headlights. Approximately five to eight men were walking in and around the field, and several people were standing near the apartment buildings. As the officers stepped out of the car, they were simultaneously receiving information from dispatch that at least two calls "had come in for random gunfire, one of which was on Walcott Place."[3] (Id. at 17.) The officers did not, at the time they got out of their car, have any suspect description.

Officer Gaines testified that, as the patrol car came to a stop, the officers saw "about five to eight males . . . walking from Walcott Place, the actual street, onto the field" where the officers' car was parked. (Id. at 12.) They also saw a man in a red shirt walking towards the rear of the officers' car. Officer Gaines stated that the man "appeared to be maybe favoring one of his arms," and that the officers were therefore "uncertain if he had been shot or not."[4] (Id. at 13.)

---

[2] Officer Gaines and Officer O'Brien both wore body cameras, the footage of which was admitted in evidence. Officer Gaines activated his body camera immediately before interacting with Curry. Activation of the camera initiates audio, but the camera automatically records video without audio for thirty seconds prior to activation. Officer O'Brien started his body camera a few seconds before the officers arrived at the field near Walcott Place.

[3] One call reported that the shots had come from "[o]n Creighton Road." (Hr'g Tr. 33.) The vast weight of the evidence, including all four officers' response to hearing the shots, indicates that the shots originated from Walcott Place.

[4] Before leaving the car, someone remarked, "[h]e's holding his arm. What's he doing?" (O'Brien BodyCam at 0:31.) Officer Fitzpatrick later spoke with that man, and no call for medical assistance followed.

Body camera footage ("BodyCam") shows that, before stepping out of the car, Officer Gaines yelled, "Get down!" (O'Brien BodyCam at 0:32; Hr'g Tr. 40.) It is unclear to whom he directed that command. Officer Gaines testified, and the video confirms, that when the car stopped he "immediately exited the vehicle and began illuminating [with his flashlight] the individuals [he had] seen, their waistbands and hands, looking for any handguns or firearms." (Hr'g Tr. 15.) The officers "all fanned out and began approaching different individuals." (*Id.*) Officer Gaines said his "attention was directed toward" Curry, who Officer Gaines estimated was "[m]aybe 25 yards" from where the shots originated. (*Id.* at 15–16.) Curry and another man, who was wearing a blue jacket, were both walking away from the officers, but were not doing so together.[5] Other people, likely residents or visitors stood in the background, closer to the apartments.

While walking toward Curry and the man in the blue jacket, Officer Gaines stated in an authoritative tone, "Let me see your hands. Both of you. Let me see your hands."[6] (O'Brien

---

[5] Video from the scene confirms that the officers stopped several men walking on the grass field behind Walcott Place. The record, however, does not support a finding that these individuals constituted a "group," much less one walking in tandem. (*Contra, e.g.*, U.S. Suppl. Br. 13–14 (arguing that the "five to eight men moved in tandem" and constituted a "group").)

Although Officer Gaines testified that he saw "about five to eight males," (Hr'g Tr. 12), the body camera videos show only about three of the men. Testimony confirmed that all men were walking away from a cut-through from Walcott Place, away from where the gunshots originated. None of the pedestrians shown in the body camera footage were walking alongside one another or speaking with each other. The Officers had to fan out to approach them individually. And, although the United States consistently characterized these men as a "group" during the suppression hearing, (Hr'g Tr. 14, 41, 68), Officer Gaines never described the men as a group or testified that he or the other officers viewed them as associated with one another.

[6] Officer Gaines testified that he approached Curry and another man and "asked [Curry to] let me see his hands. I *asked* actually both males to let me see their hands, and both of them raised their hands above their head." (Hr'g Tr. 16, 42–44 (emphasis added).) Officer Gaines also stated that he "engaged [Curry] in conversation." (Hr'g Tr. 16.)

The Court found Officer Gaines, overall, to be a credible witness. However, his description of aspects of this interaction did not directly mirror the video record in some

4

BodyCam at 0:51.) Officer Gaines testified that he "just walked in both of their direction and began illuminating them with my flashlight. It wasn't just [Curry] I was looking for. I was looking at everyone's hands." (Hr'g Tr. 42.) Officer Gaines said he told Curry to show the officers his hands "[g]iven the . . . calls that were coming in, what [he] had just heard to be gunshots, and the propensity for violence that had been occurring on the property in the last several months, and also for [his] safety and the safety of [his] partners." (*Id.*) After Officer Gaines commanded, "Let me see your hands" the first time, Curry and the man in the blue jacket, both of whom were separately walking away from Officer Gaines, stopped and began turning around and raising their hands. (O'Brien BodyCam at 0:52.) By the time Officer Gaines finished saying "Both of you," Curry and the man in the blue jacket had both turned completely around to face Officer Gaines, stopped moving, and raised their hands in the air. (O'Brien BodyCam at 0:53.) While people watched from near the buildings, the officers spoke with each man walking in the field and stopped and searched at least two of them.[7]

Officer Gaines testified that when he first saw Curry, Curry "had a cell phone in his left hand," and was walking without putting his hands in his pockets or in his waistband. (Hr'g

important aspects. Here, the shouted order, "Let me see your hands. Both of you." heard on Officer O'Brien's body camera manifestly constituted a command, not a request.

Relative to the video, Officer Gaines regularly underplayed his show of authority when testifying about September 8, 2017 incident. Briefing from the United States, even after given the opportunity to supplement, compounds this error. The United States repeatedly describes Officer Gaines as "asking" Curry to see his hands or to lift his shirt. (*See, e.g.*, U.S. Suppl. Br. 3.) Nothing about the officers' conduct here, however, indicates a casual or consensual encounter. *See infra* Section II.B.

[7] While Officer Gaines approached Curry and the man in the blue jacket, Officer O'Brien stopped to talk to an individual in a white shirt, to whom he said, "What happened man?" (O'Brien BodyCam at 0:49.) The individual held his hands out at his sides while Officer O'Brien scanned the man's midsection without either touching him or commanding him to lift his hands or shirt. Saying nothing more, Officer O'Brien moved toward Officer Gaines and Curry. As Officer O'Brien moved toward Officer Gaines and Curry, Officer Gaines's body camera showed another officer speaking with the man in the blue jacket, lifting that man's shirt up and looking around the man's midsection.

Tr. 39.) Curry made no furtive gestures, and did not walk at an accelerated pace indicative of flight. Officer Gaines testified that, upon his order, Curry "and the other male stopped, raised both hands up quickly, and then brought them right back down" when ordered to show their hands. (*Id.* at 44.) Officer Gaines recounted that Curry "pointed back towards where I had seen him walking, which is on Walcott Place," and stated that the gunshots had come from that direction. (*Id.* at 16–17.)

The video confirms that Curry stood completely still facing Officer Gaines for approximately four seconds after being ordered to do so before lowering his hands or moving at all. Curry then started walking toward Officer Gaines with his right hand still raised, his right finger pointing to his right, and his left hand crossing in front of his body but still fully visible to Officer Gaines and also pointing to the right. At that point, Officer Gaines's audio activated, and he said in a commanding voice, "Stay where you are!" (Gaines BodyCam at 0:30.) Curry stopped, keeping his right hand in the air, and responded, "Relax." (*Id.*) Officer Gaines demanded, "What came from what?" (*Id.* at 0:32.) Curry then put both of his hands down near his sides, and, still pointing to his right, said, "The gunshots come from this way. I'm looking for my nephew." (*Id.* at 0:33–0:36.) Gaines interrupted Curry as Curry said he was looking for his nephew, and said, "Pick your—pick your shirt up."[8] (*Id.* at 0:35.) Given how close the two men were, the video shows only the two men's shoulders and heads, but Curry reached down, quickly lifted his shirt, then looked back at Officer Gaines. (*Id.* at 0:35.) Officer Gaines characterized Curry as complying with this command in a "lackadaisica[l]" manner, "nonchalantly pick[ing up] the left side [of his shirt] where I could not get a full view of his was

---

[8] Officer Gaines testified that, rather than commanding, he "asked [Curry] if he could lift his shirt up" and that he did so "given the nature of the call, what we had just heard[,] and the recent violence in the area." (Hr'g Tr. 17.) Based on the footage from the body cameras, the Court finds that Officer Gaines ordered Curry to lift his shirt up at least twice.

6

waistband." (Hr'g Tr. 17.) Officer Gaines then ordered, "Pick your shirt *up*," and Curry

responded, "I'm liftin' it up." (Gaines BodyCam at 0:36–0:37.)

Officer Gaines, "not satisfied that [Curry] did not have any weapons[,] given that he did

not show full compliance . . . began circling to his right side, the side that he had not picked up

and asked him to lift his shirt up again." (Hr'g Tr. 18.) According to Officer Gaines, Curry did

not lift up his shirt again, but instead "circled away from" Officer Gaines. (*Id.*) Officer Gaines

stated that Curry "was turning away from me and kind of blading[9] his body. And at one point

he actually reaches towards his right side." (*Id.*) The video shows the two moving in a circle at

very close range.

Officer Gaines, unable to visually check for a bulge because of what he deemed

noncompliance,[10] called to Officer O'Brien, and instructed Officer O'Brien to help him "pat

[Curry] down for weapons. At that point, Officer O'Brien took control of [Curry's] left arm, and

I took control of his right arm, and we positioned him for a pat down for weapons." (*Id.* at 19.)

Officer Gaines stated that, as Officer O'Brien approached, Curry "was still being evasive in his

posture," and "not allowing [us] to, I guess, get to his right side. . . . He just kept turning away

from us where we could not see his right side. He was circling away." (*Id.* at 19–20.) The video

corresponds with Officer Gaines's testimony.[11]

---

[9] Officer Gaines described "blading" as "kinda turning his body." (Hr'g Tr. 19.)

[10] Officer Gaines testified: "I asked [Curry] several times to stop moving around so
could actually physically see if there was a bulge or something protruding from his waistband
that would confirm that he was armed or not. And then once I made the decision to pat him
down, he struggled to prevent that from taking place." (Hr'g Tr. 43.)

[11] As the two men began moving in a circle, Officer Gaines said, "My man," and Curry
replied with something that sounds like, "Hey," or "I ain't." (Gaines BodyCam at 0:40.) Officer
Gaines asked, "What are you doin'?" and Curry responded, "What?" (*Id.* at 0:42.)
    At that point, Officer O'Brien appeared in the frame, standing on Curry's left side.
Officer O'Brien lifted his right hand, holding Curry's left elbow, while Officer Gaines ordered

Officers Gaines and O'Brien then began to pat Curry down. Officer Gaines testified that

he patted Curry's right side down on top of his clothes and "felt a hard object consistent with like

the butt of a handgun." (*Id.* at 20.) Officer Gaines said to Officer O'Brien: "It's on him,"

meaning "a handgun or a firearm." (*Id.* at 21.) Officer Gaines testified that Curry then "began

struggling with us. I was never able to fully retrieve the object that I felt. We struggled. We did

like one big circle before [Curry] was able to be taken to the ground and placed into custody."

(*Id.*) Here, the video also largely matches Officer Gaines's testimony about what happened.[12]

The darkened video footage showed Officer O'Brien handcuffing Curry, while Curry lay

on his stomach on the ground. The officers helped Curry stand up. After Curry was taken into

custody, Officer Gaines testified that he found the flashlight he had dropped during the struggle

on the ground approximately one to one-and-a-half feet from the location where Curry had been

taken to the ground. "[R]ight next to" Officer Gaines's flashlight was a silver revolver. (*Id.*

at 23.)

---

Curry, "Stop movin' around." (*Id.* at 0:45.) Officer Gaines directed Officer O'Brien, "Pat him down." (*Id.* at 0:46.) Officer O'Brien put both his hands on Curry's left arm, and Officer Gaines again commanded Curry, "Stop moving." (*Id.* at 0:47.) Curry said, "I'm *tryin'* to stop!" (*Id.* at 0:48.)

[12] Officer Gaines, who was on Curry's right side, said, "He got – hey, it's – it's – it's on him. It's on him." (Gaines BodyCam at 0:48–0:49.) Curry asked, "Ho, ho, ho, what are you doin'?" as Gaines repeated, "It's on him, it's on him." Curry and both officers fell to the ground. As the three men fell, Curry asked, "What did I do?" and Officer Gaines continued to repeat, "It's on him, it's on him." (*Id.* at 0:54–0:55.) An apparent struggle ensued, and Officer Gaines said, "You gonna get tased." (*Id.* at 1:01.) Officer O'Brien gained control of Curry, who was on the ground on his stomach.
    Officer O'Brien then told Curry, "Put your hands behind your back," and Curry responded, slightly muffled, "My hands're behind my back." (*Id.* at 1:07–1:08.) Officer Gaines then directed Officer O'Brien: "All right, cuff him, cuff him, cuff him, cuff him." (*Id.* at 1:09.) Officer Gaines commanded a passersby who appeared on video: "Get back! I'm not gonna tell either of yous. Get back!" (*Id.* at 1:11–1:15.)

## II. Analysis: Whether and When a Seizure Occurred

Curry's Motion to Suppress alleges one Fourth Amendment violation. Curry contends that, at the time Officer Gaines stopped him in the field near Walcott Place, Officer Gaines lacked reasonable articulable suspicion that Curry was engaged in criminal activity. Given this lack of particularized suspicion, Curry argues that Officer Gaines violated the Fourth Amendment by stopping him.

No case from the United States Court of Appeals for the Fourth Circuit, nor from any other court, falls on all fours with the circumstances before this Court. Based on arguments advanced by the parties, the Court must decide whether these officers, given the circumstances of having heard shots fired moments before, had reasonable articulable suspicion to stop each of the men they saw walking on the grass field moments after shots were fired that night. The commanding conduct of the police and existing law constrain this Court to conclude that the officers exceeded constitutional bounds. Even taking into account their training and experience, the officers lacked reasonable articulable suspicion for stopping these pedestrians rather than others. Moreover, even if the Court were to credit Officer Gaines' perception that Curry did not submit to his show of authority, binding law would not allow Officer Gaines's subjective interpretation of Curry's actions to inform whether, under the law, Curry's conduct thereafter allowed Officer Gaines to proceed with a search. In short, the Court must grant the motion to suppress.

### A.     Legal Standard:  Whether a Seizure Occurred

The Fourth Amendment protects "[t]he right of all people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Not all police encounters with citizens, however, implicate the Fourth Amendment. "As a general matter, law

enforcement officers do not seize individuals 'merely by approaching [them] on the street or in other public places and putting questions to them.'" *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015) (quoting *United States v. Drayton*, 536 U.S. 194, 200 (2002)). Rather, a Fourth Amendment seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry*, 392 U.S. 1, 19 n.6 (1968). In circumstances in which "physical force is absent, a seizure requires both a 'show of authority' from law enforcement officers and 'submission to the assertion of authority' by the defendant." *Stover*, 808 F.3d at 995 (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).

"To determine whether police have displayed a show of authority sufficient to implicate the Fourth Amendment, a court applies the objective test set forth in *United States v. Mendenhall*, 446 U.S. 544 (1980) (plurality opinion)." *Stover*, 808 F.3d at 995 (citation modified). Under *Mendenhall*, a show of authority implicates the Fourth Amendment "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave." *Mendenhall*, 446 U.S. at 554. The totality-of-the-circumstances test involves the consideration of numerous non-exclusive factors.[13] If, in view of all the relevant circumstances, a reasonable person would not feel free to terminate the encounter, the encounter is not consensual, and the Fourth Amendment might be implicated. *Stover*, 808 F.3d at 995

---

[13] These factors include: (1) the number of police officers present; (2) whether the officers were in uniform; (3) whether the officers displayed their weapons; (4) whether they touched the defendant or made any attempt to block his or her departure or restrain his or her movement; (5) the use of language or tone of voice indicating that compliance with the officers' requests might be compelled; (6) whether the officers informed the defendant that they suspected him or her of illegal activity, rather than treating the encounter as routine in nature; and, (7) whether, if the officers requested some form of identification, they promptly returned it. *United States v. Black*, 707 F.3d 531, 537–38 (4th Cir. 2013) (citing *Mendenhall*, 446 U.S. at 554).

This court must undertake one more inquiry, however, because *Mendenhall* "states a *necessary*, but not a *sufficient* condition for . . . seizure effected through a 'show of authority.'" *Hodari D.*, 499 U.S. at 628. When the parties dispute whether an individual in fact *submitted* to a police show of authority, the Court must determine whether and when submission occurred. *See id.* at 628–29; *Brendlin*, 551 U.S. at 254; *Stover*, 808 F.3d at 995. "[W]ithout actual submission" to police show of authority, "there is at most an attempted seizure," which is outside Fourth Amendment protection.[14] *Brendlin*, 551 U.S. at 254.

The determination of when a defendant sufficiently submits to police authority to effectuate a seizure is often layered. Clearly, "[a] defendant does not have to remain frozen in order to submit" to police authority and thereby be seized. *Stover*, 808 F.3d at 998. "Physical movement alone does not negate the possibility that a seizure may nevertheless have occurred." *United States v. Wilson*, 953 F.2d 116, 123 (4th Cir. 1991). Equally clear, a defendant need not "bolt from the scene to signal non-submission." *Id.* Conduct that falls between these two bright lines, however, can involve "a difficult, fact-intensive inquiry." *Stover*, 808 F.3d at 996.

## B.    Curry Was Stopped When He Responded to Officer Gaines's Command

Despite inaccurately downplaying Officer Gaines's commanding conduct that night, the United States does not contend that the police show of authority did not, at some point, implicate the Fourth Amendment. Nor does Curry. Rather, the parties dispute the moment at which Curry became seized for Fourth Amendment purposes.

---

[14] Submission can take the form of "passive acquiescence," and in those situations, a court determines whether a seizure occurred by reference to the test enunciated in *Mendenhall*. *Brendlin*, 551 U.S. at 255. Neither side suggests that the issue of passive acquiescence exists in this case, and the Court sees none. Accordingly, the Court looks to *Hodari D.* to determine whether Curry in fact submitted to the show of authority, rather than applying the test from *Mendenhall*.

11

In its supplemental brief, the United States argues that Curry "was not seized until, at the earliest, . . . police grabbed him and attempted to subdue him." (U.S. Suppl. Br. 26.) According to the United States, because Curry "did not comply with [the officers' requests to show his hands and lift his shirt], he could not be deemed seized" because "'there is no seizure without actual submission.'" (*Id.* (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007).) Further, when arguing against a finding that Curry passively acquiesced, the United States contends that "every one of [Curry's] acts once he began interacting with police was designed to conceal from the officers the firearm that he had on his person and prevent them from learning the very fact that their requests . . . were designed to uncover." (*Id.*)

Curry counters that "a suspect who stops in response to police commands needs to do nothing more to be considered stopped." (Def.'s Suppl. Br. 3, ECF No. 30 (citing *United States v. Johnson*, 620 F.3d 685, 691 (6th Cir. 2010).) Curry avers that, because he halted and raised his hands when Officer Gaines told him to do so, he submitted "to police authority, sufficient to establish a Fourth Amendment seizure." (*Id.* at 4 (citing *Hodari D.*, 499 U.S. at 628–29.)

Because a reasonable person in Curry's position would not have felt free to disregard Officer Gaines's command to stop and raise his hands, the encounter was not consensual, and Officer Gaines's show of authority implicated the Fourth Amendment. Because Curry submitted to that show of authority when he stopped and raised his hands, he was seized for Fourth Amendment purposes at that time. As explained below, under Fourth Circuit law, Curry's subsequent actions do not alter this conclusion.

### 1. A Reasonable Person in Curry's Position Would Not Have Felt Free to Leave When Officer Gaines Told Him to Raise His Hands

Officer Gaines's command for Curry to stop and raise his hands constituted a show of authority that made the encounter nonconsensual and implicated the Fourth Amendment. In

view of the totality of the circumstances, a reasonable person in Curry's position would have felt that he was not free to leave when Officer Gaines ordered him to raise his hands. At least four of the seven so-called *Mendenhall* factors mandate that finding here.

Officer Gaines and at least two other officers in uniform approached Curry and several other men in the field near Walcott Place. The officers arrived on the scene in a marked police car. No officer drew a weapon, but the interaction began with Officer Gaines yelling "Get down," and continued as four uniformed officers emerged from the marked car simultaneously, "fann[ing] out and . . . approaching different individuals." (Hr'g Tr. 15.) Officer Gaines and Officer O'Brien, approached some of the men walking in the field and, illuminating them with their flashlights, commanded them in loud, authoritative voices to stop, raise their hands, and lift up their shirts. No officer informed Curry that he was suspected of illegal activity, nor requested or demanded any identification from him. However, Officer Gaines authoritatively directed Curry and the other man, "Let me see your hands. Both of you, let me see your hands." (O'Brien BodyCam at 0:51.) Officer Gaines's "tone of voice indicat[ed] that compliance with [his] request might be compelled."[15] *Mendenhall*, 446 U.S. at 554. Finally, the manner in which the officers conducted the sweep of the field near Walcott Place made it clear that the encounter was not routine in nature and, at the very least, the officers suspected *someone* of illegal activity. Accordingly, in view of the totality of the circumstances, a reasonable person in Curry's position would not have felt free to leave and the Fourth Amendment might be implicated. *See Mendenhall*, 446 U.S. at 553–54.

---

[15] Indeed, when Officer Gaines became dissatisfied with the extent to which Curry followed his directives, he did later compel Curry to comply with a later order he gave to "[l]ift [his] shirt up." (Gaines BodyCam at 0:35.)

The Court must next determine whether Curry submitted to the show of authority in a manner that effectuated a seizure.

> [T]he critical inquiry here [is] where to draw the line between submission and non-submission in the face of an individual's equivocal reaction to police acts initiating a show of authority.

*Stover*, 808 F.3d at 999. Here, where the parties dispute the legal upshot of Curry's ambiguous reaction, Fourth Circuit law and the facts of this case require a finding that Curry submitted to the authority shown by Officer Gaines.

### 2. Curry Submitted to Officer Gaines's Show of Authority When He Halted, Changed Directions, and Raised His Hands

After Officer Gaines told Curry to raise his hands, Curry stopped walking, turned around, and raised his hands. The Court concludes that Curry was seized for Fourth Amendment purposes, notwithstanding Curry's later "lackadaisical" compliance with Officer Gaines's command to lift his shirt, Curry's failure to fully show Officer Gaines his waistband, and the movements Curry made that Officer Gaines described as an attempt to hide or blade his right side. The seizure was effectuated when Curry stopped, changed directions, and raised his hands in response to Officer Gaines's commands, and the seizure continued because Curry did not at any point attempt to either flee or terminate the interaction with the officers.

"[D]etermining what constitutes 'submission' can be a difficult, fact-intensive inquiry." *Stover*, 808 F.3d at 996. "[W]hat may amount to submission depends on what a person was doing before the show of authority," and in certain circumstances, even "not getting up to run away" can constitute a submission to authority that amounts to a seizure. *Brendlin*, 551 U.S. at 261. Importantly here, "[a] defendant does not have to remain frozen in order to submit." *Stover*, 808 F.3d at 998.

14

In *Stover*, the Fourth Circuit found that the defendant had not submitted to the police show of authority when, after the police blocked in his double-parked car, he "opened his door, emerged from the car, and opened the driver's side backseat door," and, standing between the two doors, never acknowledged the officer, then "quickly walked about five or six feet" to the front of the car where he tossed a loaded gun before getting back in the car at the officer's command. *Stover*, 808 F.3d at 993. The Fourth Circuit, affirming the district court's denial of Stover's motion to suppress, held that Stover had not submitted to police authority until he got back into the car. *Id.* at 1000. The Fourth Circuit identified "the crux of [the] case [as] an individual's ambiguous reaction at the outset of a police show of authority." *Id.* at 998–99. The court held that

> [t]he problem for Stover is that . . . he did not submit to police authority at any point before he began that walk. Stover's initial action was not to cooperate with police and answer their questions . . . . Rather, as soon as the police blocked his Silverado, he left the car, disobeyed a police order to return to the car, and instead walked away from the police with a loaded gun in his hand. Only after he discarded that gun and was confronted by an armed police officer did Stover submit to police authority.

*Id.* at 999.

Unlike Stover, Curry did not display an "equivocal reaction to police acts initiating a show of authority." *Id.* Rather, after Officer Gaines commanded, "Let me see your hands," Curry stopped, turned toward Officer Gaines, and raised his hands in the air for at least four seconds.[16] Furthermore, even after Curry dropped one of his hands, he remained standing with,

---

[16] The Court identifies the timing as four seconds because the body camera makes doing so with exactitude possible. The Court is mindful of its obligation not to unfairly second-guess police conduct that occurs in dangerous and quickly unfolding circumstances. *See, e.g., United States v. Hernandez-Mendez*, 626 F.3d 203, 208 (4th Cir. 2010) (holding that the reasonable suspicion inquiry "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person" (internal quotation marks omitted)).

and speaking to, Officer Gaines. He did not walk away or attempt to terminate the encounter. Under the circumstances here, Curry submitted to the police show of authority, and was seized at the moment he stopped, turned around, and raised his hands.

The United States argues that "every one of [Curry's] acts once he began interacting with police was designed to conceal from the officers the firearm that he had on his person and prevent them from learning the very fact that their requests to defendant were designed to uncover." (U.S. Suppl. Br. 26.) That alone is plainly insufficient to compel a holding that Curry did not submit to Officer Gaines's commands. *See Stover*, 808 F.3d at 1001 ("Nor do we hold that an effort to conceal evidence or contraband, by itself, constitutes non-submission."). The United States' argument that Curry "cannot realistically be said to have 'submitted' when he briefly raised and then lowered his hands, lifted his shirt only partially, and kept moving and turning to prevent the officers from learning about the gun on his person" similarly fails. *See Stover*, 808 F.3d at 1001 ("With our holding today, we do not disturb our observation . . . that '[p]hysical movement alone does not negate the possibility that a seizure may nevertheless have occurred.'") (citing *United States v. Wilson*, 953 F.2d 116, 123 (4th Cir. 1991)).

Rather, Curry's actions in this situation are much more analogous to the defendant's actions in *United States v. Brown*, 401 F.3d 588 (4th Cir. 2005). There, an officer ordered Brown to place his hands on a car. *Id.* at 591. As he did so, the officer saw a bulge in the rear pocket of Brown's pants consistent with the shape of a gun. *Id.* Two officers then drew their weapons, pointed them at Brown, and ordered Brown to keep his hands on the car. *Id.* "Brown became very nervous and began to lift his hands up and down on the car." *Id.* An officer

---

Even accounting for that appropriate caveat on review, the Court finds that Curry submitted because he identifiably stopped and complied when ordered to do so by Officer Gaines. And, for the reasons next stated, Curry's subsequent conduct, which the United States characterizes as non-compliance, differs too greatly from conduct deemed non-compliant in other cases for the Court to adopt that conclusion here.

removed the gun from Brown's pocket, handcuffed Brown, and put him in a patrol car. *Id.*

Identifying "the critical inquiry [as] at what point did Brown submit to the assertion of authority"

by the officers," the court "conclude[d] that Brown submitted to the officers' show of authority

when, at the officers' command, he first leaned over and placed his hands on the car." *Id.* at 594.

The court held:

> Throughout the exchange, Brown was nervous and fidgety. He lifted his hands up
> and down, and he told the officers to take the firearm out of his back pocket. To
> be sure, *by lifting his hands up and down, Brown may have suggested that he might
> stop submitting to the officers' assertion of authority and possibly attempt to flee
> the scene or confront the officers. However, that Brown lifted his hands up and
> down does not nullify the fact that he initially submitted* to Officer Lewis'[s] order
> by leaning toward and placing his hands on the car, and that submission led to the
> discovery of the firearm in his back pocket.

*Id.* at 594–95 (emphasis added).

Here, Curry similarly behaved in a "nervous and fidgety" manner after his initial

submission. He did not keep his hands in the air for the entire encounter, and he moved while

talking with Officer Gaines. But Curry moved at a normal pace toward Officer Gaines, and did

so while pointing elsewhere, not making furtive gestures. Curry did not hide his hands, and they

remained, for much of the encounter, at or above his shoulders. He indicated where he thought

the shots had come from, and his statements matched Officer Gaines's then-observations.

Curry's movements, like Brown's, "do[] not nullify the fact that he initially submitted to" Officer

Gaines's order by changing directions, stopping, and placing his hands in the air. *See id.* at 595.

To be fair, this record likely could support a finding that Officer Gaines did not *perceive*

Curry as submitting to his show of authority. Of course, his focus on the potential danger at the

time also appears to have resulted in Officer Gaines remembering this interaction as one

involving requests rather than commands, which it was not. But the Fourth Circuit has never

applied this so-called "reasonable officer" standard when evaluating submission to a show of

authority.  Some believe strongly that it should not.  *See Stover,* 808 F.3d at 1006–07 (Gregory, J., dissenting) ("Fortunately, the majority's opinion does not, and cannot, adopt the 'reasonable officer' test.  The test does not deserve the slightest credence.").  Accordingly, the facts at bar, when applied to binding law, establish that Curry was seized for Fourth Amendment purposes at the moment he stopped, faced Officer Gaines, and put his hands in the air.

### III.  Analysis:  Whether the Seizure Was Reasonable

Based on the footage from the body cameras and Officer Gaines's testimony at the evidentiary hearing, Officer Gaines possessed no reasonable articulable suspicion particularized to Curry when he stopped Curry.  At the most, Officer Gaines had a mere suspicion that one of the men in the general area near Walcott Place had been involved in or had knowledge of the shots fired.  That level of suspicion, however, is insufficient to justify a *Terry* stop.

### A.    Legal Standard:  *Terry* Stops

The Fourth Amendment's protections apply to all seizures, including the brief investigatory stops—so-called "*Terry* stops"—authorized by the Supreme Court in *Terry v. Ohio,* 392 U.S. 1 (1968).  An officer may conduct a *Terry* stop only if the stop is "supported by reasonable articulable suspicion that the individual is engaged in criminal activity."  *United States v. Black,* 707 F.3d 531, 537 (4th Cir. 2013) (citing *Terry,* 392 U.S. at 21).  The standard for reasonable suspicion can be difficult to precisely articulate, but it "'is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'"  *United States v. Brugal,* 209 F.3d 353, 359 (4th Cir. 2000) (quoting *Wardlow v. Illinois,* 528 U.S. 119, 120 (2000)).

The Fourth Circuit has emphasized that "the Constitution requires 'a *particularized* and objective basis for suspecting *the particular person stopped* of criminal activity.'"  *United States*

*v. Massenburg*, 654 F.3d 480, 485 (4th Cir. 2011) (quoting *United States v. Griffin*, 589 F.3d 148, 152 (4th Cir. 2009)). Accordingly, to justify a *Terry* stop, "the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Although "factors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together," *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004) (citing *United States v. Arvizu*, 534 U.S. 266, 274–75 (2002)), when a police officer relies on an individual's supposedly "suspicious" behavior as the basis for the officer's reasonable articulable suspicion that the individual is engaged in criminal activity, the officer "must do more than simply label a behavior as 'suspicious' to make it so." *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011). In order to carry its burden of identifying a reasonable articulable suspicion, the United States "must also be able to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." *Id.*

The reasonable suspicion inquiry, however, "'allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Hernandez-Mendez*, 626 F.3d at 208 (internal quotation marks omitted) (quoting *Arvizu*, 534 U.S. at 273). Although an officer's "mere 'hunch'" cannot justify a *Terry* stop, the Court must "credit the 'practical experience of officers who observe on a daily basis what transpires on the street.'" *Id.* (quoting *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993)).

**B.** **Officer Gaines Lacked Particularized Suspicion as to Curry**

During the hearing, Officer Gaines did not articulate any facts specific *to Curry* that made him suspicious or alerted him to the possibility that Curry was engaged in criminal activity. Officer Gaines testified that he told Curry to show his hands "[g]iven the . . . calls that were coming in, what [he] had just heard to be gunshots, and the propensity for violence that had been occurring on the property in the last several months, and also for [Officer Gaines's] safety and the safety of [his] partners." (Hr'g Tr. 42.) When specifically asked why Officer Gaines approached Curry, he stated, "*It wasn't just [Curry] I was looking for. I was looking at everyone's hands.* When I said, 'Let me see your hands,' that was directed towards him and the other male." (*Id.* (emphasis added).)

Thus, Officer Gaines candidly admitted that, not only did he have no particularized suspicion as to Curry, but he was not attempting to detain only Curry. Rather, Officer Gaines testified that, given the high crime area, the recent violent incidents, and the shots he had heard, he demanded to see "everyone's hands" for his own safety and that of his partners. This generalized suspicion and fear cannot substitute for "specific and articulable facts which, taken together with rational inferences from those facts," *Terry*, 392 U.S. at 21, that support "'a *particularized* and objective basis for suspecting *the particular person stopped* of criminal activity.'" *Massenburg*, 654 F.3d at 485 (quoting *Griffin*, 589 F.3d at 152).

The United States points to a case from the Court of Appeals of Virginia as factually similar to the situation here, arguing that it supports the conclusion that Officer Gaines's actions complied with the Fourth Amendment. In doing so, the United States suggests that the law allows officers, in limited circumstances, to develop reasonable articulable suspicion as to a

group. According to the United States, under *Jackson v. Commonwealth*, 470 S.E.2d 138 (Va. App. 1996), "after an officer saw and heard gunfire, but could not immediately identify the shooter in a group of seven to eight people, the officer 'possessed probable cause to believe that a crime had been committed' and had reasonable suspicion to stop and pat down all seven to eight people." (U.S. Suppl. Br. 6, ECF No. 32 (quoting *Jackson*, 470 S.E.2d at 141).) The United States posits that the holding of *Jackson* supports the conclusion that Officer Gaines was justified in stopping Curry and ordering him to lift up his shirt.[17]

In *Jackson*, however, the defendant did not challenge the initial patdown. The opinion states, "[Jackson] *concedes* that the initial patdown was proper and lawful under *Terry*." *Jackson*, 470 S.E.2d at 141 (emphasis added). Accordingly, the issue of whether the officer in *Jackson* acted in accordance with the Fourth Amendment when he conducted a *Terry* stop and search of a group of seven or eight people standing in the area from which the officer heard and saw gunshots was not before the Court of Appeals of Virginia. *Jackson* also describes a group of people together, in closer confines, who seemingly knew each other *and acted in tandem. See Jackson*, 470 S.E. 2d at 140 (describing how "several subjects . . . went to the Oldsmobile, went inside the Oldsmobile"). Here, the individual men in the field were far enough apart that the officers had to fan out across the field to stop each of them. This collection of individual men in the same place at the same time does not sufficiently mirror the "group" in *Jackson* so as to make that case applicable. The Court is unpersuaded by the United States' reliance on *Jackson*.

---

[17] The United States also cites an unpublished Fourth Circuit case in support of this proposition. *United States v. Gayles*, 25 F. App'x 98 (4th Cir. 2001). While that case does uphold the patdown search of Gayles and "the group of individuals he was with" because the officers "reasonably suspected that a crime involving the discharge of a firearm had occurred at the location where Gayles was found," *id.* at 99, it does not support a parallel finding as to Curry here. Not only is *Gayles* unreported, but it also lacks any factual or legal detail that would allow this Court to discern its applicability. Also, the summary finding that Gayles and his group were *at the location* where shots had been fired could not be made as to Curry.

Moreover, the United States highlights in briefing the fact that Curry and others were just feet away from the scene of the crime—and were walking *away* from the fired shots—but fails to address important aspects of the rationality behind stopping even these individual men. For instance, nothing establishes how the officers developed reasonable articulable suspicion that *these men*, rather than the bystanders near the buildings, might have fired a weapon. Further, nothing explains if the officers considered, or why they discounted, the possibility that the wholly undescribed suspect could have walked in a different direction from Walcott Place, could have driven away, or even could have been in an apartment firing out. The United States' brief not only incorrectly states that no one else was there, but also no officer testified *why these men* aroused suspicion about having fired the shots heard.

And while the officers rightly sought to protect the community and themselves in the event that one of these men had been the shooter, the fact that these men walked away, separately, from a place where shots had been fired equally supports an inference that they did so for their own safety as it does that they did so to evade capture. As to the officers' safety, none of these men, including Curry, acted in a manner implicating safety concerns when the officers exited the patrol car. Had the officers proceeded in the consensual manner Officer Gaines recalled that they did, the record before the Court would be very different. But it did not. Even in these circumstances, with the attendant emergency and safety concerns, the Fourth Amendment allowed the officers only to initiate a consensual encounter, not the *Terry* stop they undertook.

**C.      Existing Law Cannot Support a Finding that Exigent Circumstances Warranted A Seizure Without Reasonable Particularized Suspicion**

In its supplemental brief, the United States pivots away from its initial stance that Officer Gaines had particularized suspicion as to Curry, or a group including him, toward a position

based on a line of cases from the Supreme Court of the United States and other courts finding

that some exigent circumstances support a limited seizure without reasonable particularized

suspicion. While the circumstances of these cases square more directly to the events before the

Court, they still do not warrant denial of Curry's motion to suppress.

Most of the cases on which the United States relies uphold the use of roadblocks to catch

fleeing suspects. The United States asserts that

> Here, police had just heard gunfire, in a public area, in a place where a homicide
> had occurred less than two weeks before, and where gunfire was a recurring
> problem. In dealing with those circumstances where the officers had seconds to
> decide what to do when they found the five to eight men, the officers' measured
> response was limited to controlling the scene and determining who might be
> armed. Their split-second decisions were reasonable.

(U.S. Suppl. Br. 13.) The United States argues that the exigent circumstances in this case,

including the officers' certainty that a crime had occurred and their ability to reach the scene of

the crime within a minute justified a suspicionless search of those in the vicinity. Although this

might be true in other circumstances, the Court cannot find that the Fourth Amendment gives

officers such broad latitude in this situation.

The United States cites to several cases upholding, in the immediate aftermath of crimes

being committed, officers' detention of groups of people without particularized suspicion of

criminal activity as to any one of the individuals. In *Palacios v. Burge*, 589 F.3d 556 (2d Cir.

2009), the United States Court of Appeals for the Second Circuit, reviewing a district court's

denial of habeas relief based on a claim of ineffective assistance of counsel, held that the

defendant's trial counsel had not acted ineffectively by failing to challenge a detention and show-

up conducted without individualized suspicion as to any individual detained. 589 F.3d at 558.

In *Palacios*, officers were surveilling a night club in Queens, New York, when a man drove up to

the officers and told them that his brother had been stabbed by "a group of Hispanic men" who

then ran towards the club. *Id.* at 559. Moments earlier, officers had seen a group of Hispanic

men run ahead of others in line and enter the club. *Id.* The officers sealed the exits to the club,

detained all the individuals in the club, and then "lined up at the front of the club the

approximately 170 men, all of whom looked to them to be Hispanic." *Id.*

Relying in part on the exigent circumstances in that case, the Second Circuit held that the

show-up, although conducted without individualized suspicion, was not unreasonable.

> The police knew that the perpetrators were within the finite group of men, whom
> the officers understood to be Hispanic, inside or lined up outside of the . . . [c]lub
> near the stabbing, and the show-up was contemporaneous to the stabbings and
> aimed to identify and arrest dangerous criminals who were likely to flee the club
> and surrounding area were it not for the police seizure. Moreover, there was a
> high risk that the two witnesses who could identify the perpetrators would not be
> available at a later time: the first, one of the stabbed victims, had severe wounds,
> and the second was a suspect who had tried to leave the scene.

*Id.* at 563. The court also relied on the "minimally intrusive" nature of the police detention in

that situation, contrasting "briefly detaining these patrons and instructing them to walk outside,"

with body frisks. *Id.*

The United States also relies on a Fourth Circuit case in which officers observed a boat

holding "bales of mari[j]uana" docked on a landing area. *United States v. Harper*, 617 F.2d

35, 40 (4th Cir. 1980). After securing the landing area, at 5:45 a.m., a federal agent stationed his

car three miles from the site, seven-tenths of a mile from a "dirt road leading to the site," and in

an attempt "to look for suspects who might be fleeing or helping others to flee via the only paved

road with access to the site." *Id.* The officer "had some knowledge of the apparent lookout at

the bridge, and, from the size and nature of the smuggling operation, he expected lookouts and

other suspects would likely be in the general area seeking to escape." *Id.* The Fourth Circuit

found constitutional a subsequent suspicionless stop that resulted in Harper's arrest.

> The purpose of these stops was to arrest suspects for a known crime, not to
> discover evidence of undetected crimes by the happenstance of visual searches. A

serious crime had been committed involving numerous participants, some of whom were *known to be fleeing the scene along a route reasonably expected to be used for their escape.* Stopping all cars there was, under such circumstances, a necessary means of law enforcement, and as such, justifies the minimal intrusion on privacy rights posed to passing motorists.

*Id.* at 40–41 (emphasis added).

The circumstances of Officer Gaines's *Terry* stop and search of Curry are sufficiently different from the cases relied on by the United States that the United States' reasoning cannot prevail. Moreover, significant recent caselaw exists within the Fourth Circuit compelling this Court to conclude that Curry's seizure, in the absence of *any* individualized suspicion that he was engaged in criminal activity, violated the Fourth Amendment.

First, notwithstanding the dramatically different procedural posture of this case and *Palacios*, the specific exigencies on which the Second Circuit relied in that case are not present here. In *Palacios*, the officers could be nearly certain that the individual or individuals responsible for the stabbing were inside the club. 589 F.3d at 563. Moreover, the officers in *Palacios* conducted a show-up "aimed to identify and arrest" the individuals responsible for the stabbing. *Id.* Further, the court identified a "high risk that the two witnesses" would not be available at a later time. *Id.* Finally, the court held that the show-up constituted a minimal intrusion, unlike a "body frisk." *Id.*

Here, although the officers themselves heard the shots and believed that the shots had come from the direction of Walcott Place, they lacked the level of certainty that the officers in *Palacios* had regarding the location of the suspects. The officers in *Palacios* were faced with an area capable of being sealed and contained; the officers here were confronted with a public area—a housing project where hundreds of families live. Here, unlike in *Palacios*, the officers did not "kn[o]w that the perpetrators were within the finite group of men" they encountered in the field near Walcott Place. *Id.* Finally, unlike in *Palacios*, the officers here had no witnesses

25

who could identify the individuals responsible for the crime, and, rather than a minimally intrusive show-up, they stopped individuals and told them to raise their shirts. Given the numerous material differences, the Court cannot find that the result reached in *Palacios* dictates the outcome here.[18]

Similarly, the situation in *Harper* is sufficiently different that it cannot govern here. In *Harper*, the officer stationed his car along the only road with access to the site of a large-scale smuggling operation from which the officer "expected lookouts and other suspects [to be] seeking to escape." *Harper*, 617 F.2d at 40. Here, in contrast, the officers were at only one of several possible escape routes from an area they believed, but only believed, to be the scene of the crime. They did not investigate any other possible escape route. Unlike the officers in *Harper*, Officers Gaines and O'Brien, when they encountered the men in the field near Walcott Place, did not confront individuals "known to be fleeing the scene along a route reasonably expected to be used for their escape." *Harper*, 617 F.2d at 40–41. In sum, then, the United States cannot rely on these cases given the facts before the Court.

---

[18] The United States also points to a more procedurally apt case from the United States Court of Appeals for the Tenth Circuit. That case, however, falters on similar grounds. In *United States v. Paetsch*, the Tenth Circuit upheld the constitutionality of a roadblock of twenty cars carrying twenty-nine people in order to identify a bank robber who was fleeing the scene twenty minutes after the crime occurred. 782 F.3d 1162 (10th Cir. 2015). In doing so, the *Paetsch* court found the limited seizure to be justified—even though it knowingly included cars not involved—because a GPS tracking device on the stolen money indicated one of the twenty cars had the stolen money it in. Despite the absence of a description of the suspect or a car, the *Paetsch* court concluded that the limited barricade and seizure was "'appropriately' tailored to catch a fleeing, armed bank robber." *Id.* at 1168. The court ruled that "gravity of the public concern in apprehending the armed bank robber and the likelihood of advancing the public interest justified the intrusion on individual liberty." *Id.*

*Paetsch*, even were it binding, does not inform this Court's analysis. First, the probability that one of the cars contained the stolen money, and therefore the armed robber, far exceeds any articulable suspicion as to Curry or the other men in the field. Second, the risk of successful flight differs by magnitudes when it could occur in an otherwise unidentified car.

Officer Gaines could not articulate any particularized, objective, or reasonable basis for suspecting Curry individually of criminal behavior.  Despite Officer Gaines's legitimate concern for his own safety and the safety of his partners, the exigencies in this situation cannot undermine the Fourth Circuit's clear holding that "the Constitution requires 'a *particularized* and objective basis for suspecting *the particular person stopped* of criminal activity.'"  *Massenburg*, 654 F.3d at 485 (quoting *Griffin*, 589 F.3d at 152).

## IV.  Conclusion

For the foregoing reasons, the Court will grant the Motion to Suppress.  (ECF No. 14.) The firearm and Curry's ensuing statements will be suppressed.  *Wong Sun v. United States*, 371 U.S. 471 (1963).  An appropriate Order shall issue.

_____ /s/

M. Hannah Lauck
United States District Judge

Date:  3/19/18
Richmond, Virginia